# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| JOSEPH B. PARSONS,<br>    Plaintiff<br>v.<br><br>NANCY A. BERRYHILL,[1]<br>**Acting Commissioner of**<br>**Social Security,**<br>    Defendant | Civil Action No. 2:16cv00007<br>**MEMORANDUM OPINION**<br><br><br><br>By:   P<small>AMELA</small> M<small>EADE</small> S<small>ARGENT</small><br>United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Joseph B. Parsons, ("Parsons"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Parsons previously filed applications for DIB and SSI on September 11, 2008, alleging disability as of February 24, 2007. (Record, ("R."), at 98.) The claims were denied initially and on reconsideration. (R. at 98.) Parsons requested a hearing before an administrative law judge, ("ALJ"), which was held on September 8, 2011. (R. at 98.) By decision dated September 16, 2011, an ALJ denied Parsons's claim, finding that he suffered from severe impairments, namely hypertension; obesity; two-level disease of the lumbar spine, including disc protrusion and extrusion; obstructive sleep apnea; and depressive disorder, not otherwise specified, but that he retained the ability to perform a limited range of light work.[2] (R. at 98-109.) The Appeals Council thereafter denied Parsons's request for review; and by order dated November 4, 2013, this court upheld the Commissioner's denial of benefits. *See Parsons v. Colvin*, Civil Action No. 2:12cv00030 (W.D. Va. Nov. 4, 2013).[3]

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2016).

[3] I find that this prior decision is res judicata. In the 2014 decision, the ALJ found that the record was "generally consistent with the findings of the prior ALJ …. New and material evidence was submitted into the record, however, and this evidence warrants the somewhat different residual functional capacity determined herein." (R. at 14.) The ALJ found that a more restricted residual functional capacity was warranted based on the new evidence. (R. at 14.)

The record shows that Parsons protectively filed his current applications for DIB and SSI on August 23, 2012, alleging disability as of September 17, 2011, due to back problems; high blood pressure; sleep apnea; breathing problems; obesity; high cholesterol; swelling in his legs; heart problems; depression; anxiety; joint and hip pain; fatigue; chest pain; and shortness of breath. (R. at 31, 56, 330-37, 354, 379, 392.) The claims were denied initially and upon reconsideration. (R. at 166-68, 172-74, 177-79, 183-85, 188-91, 193-98, 200-02.) Parsons then requested a hearing before an ALJ. (R. at 203-04.) The ALJ held hearings on July 23, 2013, December 4, 2013, and June 16, 2014, at which Parsons was represented by counsel. (R. at 29-50, 51-81, 82-93.)

By decision dated July 1, 2014, the ALJ denied Parsons's claims. (R. at 13-22.) The ALJ found that Parsons met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2012.[4] (R. at 16.) The ALJ found that Parsons had not engaged in substantial gainful activity since February 24, 2007, the alleged onset date. (R. at 16.) The ALJ found that the medical evidence established that Parsons had severe impairments, namely morbid obesity; hypertension; degenerative disc disease of the lumbar spine; obstructive sleep apnea; and depression, not otherwise specified, but she found that Parsons did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16.) The ALJ found that Parsons had the residual functional capacity to perform simple, repetitive, unskilled, sedentary work[5] that did not require more than

---

[4] Therefore, Parsons had to show that he was disabled between September 17, 2011, the day following the prior ALJ's decision, and March 31, 2012, the date last insured, in order to be eligible for DIB benefits.

[5] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a

occasional climbing of ramps and stairs, balancing and stooping; that did not require crawling or climbing ladders, ropes or scaffolds; and did not expose him to heights, hazards and vibrations. (R. at 18.) The ALJ found that Parsons was unable to perform his past relevant work. (R. at 21.) Based on Parsons's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Parsons could perform, including jobs as an assembler, a packer and an inspector/tester. (R. at 21-22.) Thus, the ALJ concluded that Parsons was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2016).

After the ALJ issued her decision, Parsons pursued his administrative appeals, (R. at 7), but the Appeals Council denied his request for review. (R. at 1-5.) Parsons then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2016). This case is before this court on Parsons's motion for summary judgment filed September 15, 2016, and the Commissioner's motion for summary judgment filed October 20, 2016.

## II. Facts

Parsons was born in 1972, (R. at 330, 334), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Parsons obtained his general education development, ("GED"), diploma and has past relevant work

---

sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2016).

as a construction worker, a heavy equipment operator, a mechanic and a tester. (R. at 47, 380.) Parsons stated that he played cards at times, talked on the phone and attended church once or twice a month. (R. at 37-38.) He stated that he could walk up to 100 feet without interruption; sit for up to 20 minutes without interruption; that he could not lift and carry objects due to pain and weakness; that stooping caused him to become lightheaded; and that he could not bend. (R. at 39-40, 42.) Parsons stated that he had been on oxygen 24 hours a day, seven days a week since February 2010. (R. at 41.) Parsons stated that he spent up to five hours a day reclining or lying down. (R. at 45.)

John F. Newman, a vocational expert, was present and testified at Parsons's July 2013 hearing. (R. at 46-50.) Newman was asked to consider a hypothetical individual of Parsons's age, education and work history, who would be limited to simple, routine, repetitive, light work that did not require more than occasional climbing of stairs or ramps, balancing, stooping, kneeling and crouching; that did not require him to crawl or climb ladders, scaffolds or ropes; and that did not require him to work around concentrated exposure to hazardous machinery, unprotected heights and vibrations. (R. at 48.) Newman stated that the individual could perform jobs existing in significant numbers in the national economy, including those of an assembler, a packer and an inspector, tester and sorter. (R. at 48-49.) Newman stated that these jobs also would be available at the sedentary level should the individual be limited to standing two hours at a time. (R. at 49.) He stated that, should the individual be required to use a large oxygenator continuously, it would not be tolerated in a competitive work environment. (R. at 49-50.) Newman stated that, should the individual be absent from work at least two days a month, competitive employment would be precluded. (R. at 50.)

Dr. Edwin Cruz, M.D., a medical expert, testified at Parsons's December 2013 hearing. (R. at 56-77.) Dr. Cruz stated that, when he completed his functional capacity assessment, he only considered Parsons's pulmonary issues. (R. at 69.) He stated that he found no objective medical evidence in the record that would indicate that Parsons needed oxygen 24 hours a day, seven days a week. (R. at 72.) Dr. Cruz recommended that Parsons obtain a pulmonary function test. (R. at 72.)

Asheley Wells, a vocational expert, testified at Parsons's June 2014 hearing. (R. at 89-92.) She was asked to consider an individual who would be limited as indicated in the functional capacity assessment completed by Dr. Cruz. (R. at 89-90, 807-12.) Wells stated that there would be jobs available that such an individual could perform, including jobs as a dishwasher, a grocery bagger and a hospital cleaner. (R. at 90.) Wells stated that, if an individual was required to utilize oxygen 24 hours a day, seven days a week, the sedentary job of a call center position would accommodate this requirement. (R. at 91.) She stated that, if the individual was seriously limited[6] in his ability to deal with co-workers, to interact with supervisors, to deal with work stress and to demonstrate reliability, there would be no jobs available that the individual could perform. (R. at 91.) Wells was asked to consider an individual who would be off task more than 10 percent of the time; who could be on his feet for only two hours in an eight-hour workday; who was limited to simple, routine tasks; and who had no ability to deal with work stresses or to demonstrate reliability. (R. at 91.) She stated that these limitations would preclude all competitive employment. (R. at 92.) She stated that, if the first hypothetical individual would be limited to simple, routine, repetitive jobs, the jobs identified would not be impacted. (R. at 92.)

---

[6] Seriously limited was defined as a limitation resulting in inadequate work performance. (R. at 91.)

In rendering her decision, the ALJ reviewed records from Wise County Public Schools; Dr. Brian Strain, M.D., a state agency physician; Stephen P. Saxby, Ph.D., a state agency psychologist; Dr. Joseph Duckwall, M.D., a state agency physician; Wellmont Holston Valley Medical Center; Robert S. Spangler, Ed.D., a licensed psychologist; Wellmont Lonesome Pine Hospital; Dr. Sam G. Vorkpor, M.D.; Dr. Bryan L. Watson, D.O.; and Dr. Edwin Cruz, M.D. Parsons's attorney submitted additional medical records from Dr. Watson and Wellmont Health System to the Appeals Council.[7]

The record shows that Parsons was treated by Dr. Sam G. Vorkpor, M.D., and Dr. Bryan L. Watson, D.O., since March 2009 for hypertension; morbid obesity; sleep apnea; anxiety; chronic back pain; hyperlipidemia; restless leg syndrome; tobacco abuse; insomnia; dyspnea; and respiratory abnormality. (R. at 591-609, 697-714, 719-26, 764-70, 780-82, 784-86, 815-20, 836-69.) Dr. Vorkpor repeatedly reported from 2009 through 2012 that Parsons's chest and lung examinations were normal. (R. at 591, 593-95, 601, 603, 606, 698, 709.) Throughout 2010 and 2011, Parsons reported significant improvement with his symptoms of sleep apnea since using his CPAP and BiPAP machine and medications, and Dr. Vorkpor noted that Parsons's sleep apnea was stable. (R. at 591, 593-95, 703.) On September 6, 2011, Parsons reported that he was experiencing severe stress related to domestic issues. (R. at 709.) That same day, Dr. Vorkpor completed a medical assessment,[8] indicating that Parsons could occasionally lift and carry items weighing up to 10 pounds and frequently lift and

---

[7] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-5), this court must also take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

[8] This assessment was considered by the ALJ in Parsons's previous claim. (R. at 105.)

carry items weighing up to 20 pounds. (R. at 756-58.) He opined that Parsons could stand and/or walk up to 15 minutes in an eight-hour workday and that Parsons's ability to sit was not impaired. (R. at 756-57.) Dr. Vorkpor opined that Parsons could occasionally climb, stoop and crouch and frequently kneel, balance and crawl. (R. at 757.) He found that Parsons had a limited ability to push and pull. (R. at 757.) Dr. Vorkpor opined that Parsons would be absent from work more than two days a month. (R. at 758.) He placed these limitations due to Parsons having difficulty breathing; sleep apnea; uncontrolled hypertension; and morbid obesity. (R. at 757.)

On January 6, 2012, Parsons stated that he felt well and voiced only minor complaints. (R. at 702.) He reported that he was under severe stress due to domestic problems. (R. at 702.) On April 6, 2012, Parsons reported that he felt well and voiced only minor complaints. (R. at 700.) His blood pressure reading was 124/88, and his respiratory and musculoskeletal examinations were normal. (R. at 700-01.) On August 6, 2012, Parsons weighed 375 pounds, and his body mass index was 46.87. (R. at 697.) He reported that he continued to smoke one pack of cigarettes a day. (R. at 697.)

On January 18, 2011, Parsons was admitted at Wellmont Lonesome Pine Hospital, ("Lonesome Pine"), with complaints of intractable vomiting and chest pain. (R. at 539-42.) Parsons's respiration reading was 26 per minute; his oxygen saturation level was 95 percent; and he had decreased bilateral breath sounds. (R. at 541.) X-rays of Parsons's chest showed an enlarged heart and mild pulmonary vascular congestion. (R. at 535.) He was discharged the following day with diagnoses of chest pain; accelerated hypertension; and chronic obstructive pulmonary disease, ("COPD"). (R. at 539.) On July 3, 2012, Parsons presented to

the emergency room at Lonesome Pine with complaints of chest pain, weakness and nausea. (R. at 626-57.) A chest x-ray showed a significantly enlarged heart and clear lungs. (R. at 656.) Parsons's respiration reading was 20 per minute; his oxygen saturation level was 98 percent on room air; and he had good breath sounds with no rales, rhonchi or wheezing. (R. at 626, 629.). He weighed 375 pounds; his extremities were normal with adequate strength and full range of motion; no lower extremity swelling or edema was noted; and he had appropriate demeanor and interpersonal interaction. (R. at 628, 630.) It was recommended that Parsons be admitted to rule out myocardial infarction; however, he signed out against medical advice. (R. at 649.)

On September 27, 2012, Dr. Brian Strain, M.D., a state agency physician, completed a medical assessment, indicating that Parsons had the residual functional capacity to perform light work. (R. at 121-23.) He opined that Parsons could frequently climb ramps and stairs and balance; occasionally stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. (R. at 122.) No manipulative, visual or communicative limitations were noted. (R. at 122-23.) Dr. Strain opined that Parsons should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation and hazards, such as machinery and heights. (R. at 123.)

The record shows that Parsons treated with Dr. Bryan L. Watson, D.O., from November 2012 through October 2015. During this time, Parsons repeatedly reported that he felt well and voiced only minor complaints. (R. at 722, 765, 780, 784, 815, 818.) Parsons routinely reported that he was compliant with treatment for his lower back pain and that he had fair to good symptom control. (R. at 719, 722, 765, 780.) He repeatedly reported that his symptoms were relieved with

medications. (R. at 765, 768, 815, 818, 836, 854-55, 858, 862, 866.) Dr. Watson consistently reported that Parsons's chest and lung examination was normal. (R. at 719-20, 722-23, 768-69, 781, 784-85, 815-16, 818-19, 845, 850, 853, 860, 864, 867.) Dr. Watson reported that Parsons's neurologic and musculoskeletal examinations were normal with the exception of lumbosacral spine tenderness. (R. at 723, 769, 781-82, 785-86, 816-17, 819-20.)

Dr. Watson routinely reported that Parsons was able to articulate well with normal speech, rate, volume and coherence; his thought content was normal; he displayed no evidence of hallucinations, delusions, obsessions or homicidal/suicidal ideation; he demonstrated appropriate judgment and insight; he was able to recall recent and remote events; his fund of knowledge was intact; his attention span was intact; his ability to concentrate was normal; and his mood and affect were normal. (R. at 766, 781, 785, 816, 819, 838, 845, 850, 853, 857, 860, 864, 868.)

On August 5, 2013, Parsons's blood pressure reading was 112/80; his respiration reading was 14 per minute, unlabored; his oxygen saturation level was 92 percent; and he weighed 383 pounds. (R. at 819.) On August 6, 2013, Dr. Watson indicated that Parsons was on oxygen 24 hours a day, seven days a week and that the date the oxygen treatment was prescribed was February 2010. (R. at 788.) On September 5, 2013, Parsons's blood pressure reading was 130/80; his oxygen saturation level was at 94 percent; and he weighed 376 pounds. (R. at 816.) On December 4, 2013, Dr. Watson indicated that it was medically necessary that Parsons be provided oxygen treatment 24 hours a day, seven days a week. (R. at 822.)

On January 13, 2014, Parsons's blood pressure reading was 90/70; his oxygen saturation level was at 94 percent; and he weighed 374 pounds. (R. at 845.) On April 28, 2014, Parsons's blood pressure reading was 114/80; his oxygen saturation level was at 98 percent; and he weighed 374 pounds. (R. at 837.) Pulmonary examination was normal. (R. at 838.) On July 28, 2014, it was noted that Parsons's hypertension was controlled and that medication provided moderate pain relief. (R. at 865-66) His blood pressure reading was 110/76; his oxygen saturation level was at 93 percent; and he weighed 364 pounds. (R. at 867.) On October 28, 2014, it was noted that Parsons's hypertension was controlled and that medication provided moderate pain relief. (R. at 862.) Parsons smoked one pack of cigarettes a day. (R. at 863.) His blood pressure reading was 126/82; his oxygen saturation level was at 98 percent; his respiration reading was 18 per minute; he weighed 357 pounds; and his body mass index was assessed at 44.7. (R. at 864.)

On January 29, 2015, it was noted that Parsons's hypertension was controlled and that medication provided moderate pain relief. (R. at 858.) His blood pressure reading was 146/86; his oxygen saturation level was at 96 percent; his respiration reading was 16 per minute; he weighed 368 pounds; and his body mass index was assessed at 46. (R. at 859.) On July 9, 2015, Parsons reported that he occasionally experienced symptoms of anxiety. (R. at 851.) His blood pressure reading was 110/70; his oxygen saturation level was at 96 percent; he weighed 353 pounds; and his body mass index was assessed at 44.1. (R. at 852-53.) On August 6, 2015, an MRI of Parsons's lumbar spine showed a central protruded disc at the L5-S1 level encroaching on the left S1 root and abutting the right S1 root with a smaller protruded disc at the L4-L5 level. (R. at 869.) On October 22, 2015, Parsons's blood pressure reading was 110/76; his oxygen saturation level was at 94 percent; and he weighed 342 pounds. (R. at 849.)

On March 13, 2013, Stephen P. Saxby, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Parsons had no limitations in his activities of daily living, experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 155.) Saxby noted that Parsons would have mild limitations in social interaction and concentration, persistence and pace. (R. at 155.)

On March 14, 2013, Dr. Joseph Duckwall, M.D., a state agency physician, completed a medical assessment, indicating that Parsons had the residual functional capacity to perform light work. (R. at 156-58.) He opined that Parsons could occasionally climb ramps and stairs, balance, stoop, kneel and crouch and never climb ladders, ropes or scaffolds and crawl. (R. at 157.) No manipulative, visual or communicative limitations were noted. (R. at 157.) Dr. Duckwall opined that Parsons should avoid concentrated exposure to temperature extremes; vibration; and hazards, such as machinery and heights. (R. at 158.)

On June 7, 2013, Robert S. Spangler, Ed.D., a licensed psychologist, evaluated Parsons at the request of Parsons's attorney. (R. at 772-78.) Spangler reported that Parsons presented confused and slow paced. (R. at 772.) Parsons had awkward gross motor movements secondary to back injury surgery and morbid obesity. (R. at 772.) Spangler reported that Parsons was alert, but intermittently confused; he had adequate recall of remote events; he had inadequate recall of recent events; he had fair eye contact; his motor activity was calm, but in discomfort; his affect was blunted; his mood was depressed; he was cooperative, compliant and forthcoming; his stream of thought was unremarkable; he had logical associations; his thought content was nonpsychotic; perceptual

abnormalities were noted; and he had adequate social skills. (R. at 773-74.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Parsons obtained a full-scale IQ score of 84. (R. at 774.) Spangler noted that Parsons's then-current full-scale IQ score showed a 36-point loss from his highest and last school IQ score of 120. (R. at 774.) He noted that, when comparing Parsons's IQ score of January 29, 2010, to his last school IQ score, there was a 28-point difference. (R. at 749, 774.) Thus, Spangler opined that Parsons met the listing of impairment § 12.02 on January 29, 2010, and continued to do so. (R. at 774.) Spangler diagnosed moderate depression disorder, not otherwise specified; cognitive disorder, not otherwise specified; and low average intellectual functioning. (R. at 775.) He assessed Parsons's then-current Global Assessment of Functioning, ("GAF"),[9] score at 55 to 60.[10] (R. at 775.)

Spangler completed a mental assessment, indicating that Parsons had a limited, but satisfactory, ability to maintain attention and concentration for up to 20 minutes. (R. at 776-78.) He found that Parsons had a seriously limited ability[11] to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to function independently; to maintain attention and concentration after 20 minutes; to understand, remember and carry out simple job instructions; to maintain personal appearance; to behave in an emotionally stable

---

[9] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[10] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

[11] Fair is defined as an individual's ability to function is seriously limited, resulting in inadequate work performance. (R. at 776.)

manner; and to relate predictably in social situations. (R. at 776-77.) Spangler opined that Parsons had no useful ability to deal with work stresses; to understand, remember and carry out complex and detailed job instructions; and to demonstrate reliability. (R. at 776-77.) Spangler also found that Parsons could not manage his benefits in his own best interest. (R. at 778.)

On August 25, 2013, at the request of Disability Determination Services, Dr. Edwin Cruz, M.D., reviewed Parsons's medical records pertaining to Parsons's need for oxygen therapy. (R. at 802-12.) Dr. Cruz found that none of the medical evidence supported Parsons's need for oxygen 24 hours a day, seven days a week, and he opined that Parsons did not meet or equal any of the listings of impairment. (R. at 803.)

Dr. Cruz completed a medical assessment, indicating that Parsons had the ability to frequently lift and carry objects weighing up to 100 pounds and that he could continuously lift and carry objects weighing up to 50 pounds. (R. at 807-12.) He found that Parsons could sit up to eight hours in an eight-hour workday and that he could do so for up to four hours without interruption. (R. at 808.) Dr. Cruz found that Parsons could stand and/or walk eight hours in an eight-hour workday and that he could do so for up to two hours without interruption. (R. at 808.) He found that Parsons could frequently use his hands to reach overhead and to push and pull and continuously use his hands to reach, to handle, to finger and to feel. (R. at 809.) Dr. Cruz opined that Parsons could continuously use his feet to operate foot controls. (R. at 809.) He found that Parsons could frequently balance, stoop, kneel, crouch and crawl; occasionally climb stairs and ramps; and never climb ladders or scaffolds. (R. at 810.) Dr. Cruz found that Parsons could frequently work around extreme heat and loud noise; occasionally work around dust, odors,

fumes and pulmonary irritants; and never work around unprotected heights. (R. at 811.)

On January 30, 2014, a pulmonary function test was performed at Norton Community Hospital at the request of Disability Determination Services. (R. at 826-31.) It was noted that Parsons did not smoke and that he put forth good effort. (R. at 826.) Although Parsons was advised during one of his hearings not to use oxygen during testing, (R. at 80), he proceeded to test with oxygen. (R. at 826-31.) His $FEV_1$ level was 3.73, and his FVC level was 4.33, (R. at 830), which measured his $FEV_1$ and FVC ratio at 86 percent. (R. at 830.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2016). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2016).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the

Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if she sufficiently explains her rationale and if the record supports her findings.

Parsons argues that the ALJ erred by failing to find that he suffered from a severe respiratory impairment other than obstructive sleep apnea. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Parsons argues that the ALJ erred by failing to adhere to the treating physician rule. (Plaintiff's Brief at 7-8.) In particular, Parsons argues that the ALJ failed to give controlling weight to the opinions of Dr. Vorkpor and Dr. Watson. (Plaintiff's Brief at 7-8.) Parsons also argues that the ALJ erred by failing to give full consideration to the findings of Spangler. (Plaintiff's Brief at 8-10.)

Parsons argues that the ALJ erred by failing to find that he suffered from a severe respiratory impairment other than obstructive sleep apnea. (Plaintiff's Brief at 5-7.) I agree. I note that Dr. Watson routinely reported that Parsons did not have difficulty breathing, noting quiet, even and easy respiratory effort with no use of accessory muscles and no wheezes, rhonchi, rales or crackles. (R. at 698, 701, 709, 720, 723, 726, 766, 769, 781, 785, 816, 819, 838, 845, 849-50, 852-53, 856-57, 859-60, 863-64, 867.) However, I also note that, in September 2012 a state agency physician opined that Parsons should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 123.) In addition, Dr. Cruz found that Parsons could only occasionally work around dust, odors, fumes and pulmonary irritants. (R. at 811.) These limitations were never presented to the vocational expert. Furthermore, the ALJ failed to address these limitations in her findings. It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979).

"The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight [she] has given to obviously probative exhibits, to say that [her] decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Thus, I do not find that substantial evidence exists to support the ALJ's finding that Parsons did not suffer from a severe respiratory impairment other than sleep apnea.

I also note that there is objective evidence in the record showing that Parsons suffered from an enlarged heart as early as January 2011. (R. at 535.) Parsons also was diagnosed with COPD in January 2011. (R. at 539.) The ALJ's one paragraph "analysis" of Parsons's severe impairments makes no mention of these conditions. (R. at 16.) The ALJ even recognizes this diagnosis in her analysis of Parsons's work-related abilities. (R. at 19.) There, however, she incorrectly states that Parsons's treatment records "do not suggest an ongoing need for oxygen," ignoring Dr. Watson's December 4, 2013, statement that oxygen use was medically necessary. (R. at 822.)

Parsons also argues that the ALJ erred by failing to give full consideration to the findings of Spangler. (Plaintiff's Brief at 8-10.) Based on my review of the record, I do not find that the ALJ addressed Spangler's finding with regard to an organic mental disorder. Therefore, I do not find that substantial evidence supports the ALJ's decision as to Parsons's mental residual functional capacity. The ALJ noted that she was giving "some weight" to Spangler's opinion that Parsons could

perform simple, routine work, but she did not accept his finding that Parsons would be expected to miss more than two days of work a month. (R. at 20.) It is noted that Spangler administered the WAIS-IV, and Parsons obtained a full-scale IQ score of 84. (R. at 774.) Spangler noted that Parsons's then-current full-scale IQ score showed a 36-point loss from his highest and last school IQ score of 120. (R. at 774.) He also noted that when comparing Parsons's IQ score of January 29, 2010, to his last school IQ score, there was a 28-point difference. (R. at 774.) Thus, Spangler opined that Parsons met the listing of impairment § 12.02 on January 29, 2010, and continued to do so. (R. at 774.)

In addition, Spangler found that Parsons was seriously limited, resulting in inadequate work performance, in his ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to function independently; to maintain attention and concentration after 20 minutes; to understand, remember and carry out simple job instructions; to maintain personal appearance; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 776-77.) Spangler opined that Parsons had no useful ability to deal with work stresses; to understand, remember and carry out complex and detailed job instructions; and to demonstrate reliability. (R. at 776-77.)

Section 12.02 is the listing of impairment for organic mental disorders involving psychological or behavioral abnormalities associated with a dysfunction of the brain. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied. Section 12.02(A)(7) states that demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence

of loss of measured intellectual ability of at least 15 IQ points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing resulting in at least two of the following: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompenstation, each of extended duration. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.02(A)(7), (B)(1-4) (2016).

The ALJ failed to address Spangler's finding that Parsons met the listing of impairment for § 12.02(A)(7). Thus, I cannot determine if the ALJ considered this evidence in making her determination with regard to Spangler's mental residual functional capacity.

It is for all of these reasons that I find that the ALJ erred by failing to analyze all of the relevant evidence and state the weight given to it, thereby precluding the court's ability to determine whether the ALJ's decision is supported by substantial evidence.

An appropriate Order and Judgment will be entered.

DATED:   May 3, 2017.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE